Michelle S. Nesbett
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone:  907.276.1550
Facsimile:   907.276.3680
Email:  mnesbett@bhb.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     vs.<br><br>MARIAN TILLION BECK,<br><br>          Defendant. | Case No.: 1:23-cr-00001-TMB-MMS |

**DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW, Defendant, Marian Tillion Beck, by and through undersigned counsel, and hereby submits her sentencing memorandum in anticipation of her sentencing hearing currently set for November 8, 2023, at 10:00am.

Ms. Beck will be pleading guilty to Count 2 of the indictment, Gross Negligent Operation of a Vessel, 46 U.S.C. § 2302(b), a misdemeanor.  The government has agreed to dismiss Count 1 at sentencing.  Because Ms. Beck is pleading to a misdemeanor offense, in which no person or property was harmed, and she is a first-time non-violent offender at the age of 70, one year probation with the agreed

upon fine of $25,000, is the appropriate sentence in this matter, and is sufficient but not greater than necessary to meet the sentencing goals.

## I. BACKGROUND AND OFFENSE CONDUCT

Ms. Beck has lived in the small community of Halibut Cove her entire life. Halibut Cove is a small, tight-knit community of less than two hundred people during the summer, and less than 20 during the winter. The Halibut Cove community is located primarily in a narrow, protected stretch of waterway, which runs between the hourglass-shaped Ismailof Island and the south shore of Kachemak Bay. The west entrance into the cove is called The Narrows, and is a narrow strip of shallow water. Ms. Beck owns the Saltry restaurant, which sit on the shore of Ismailof Island, with a dock in the cove. Her restaurant patrons arrive by water taxi, or one of the two ferries that service Halibut Cove, the Danny J and the Stormbird. Within the protected waters of the Halibut Cove community, residents travel by small skiffs, and children and families are often kayaking or fishing in the waters.

The entrance into the cove is extremely narrow, especially at low tide when it becomes increasingly dangerous for two vessels to pass simultaneously. A map of the area is attached as Exhibit "A," to give the Court perspective on the area in question. Also attached as Exhibit "B," are two aerial photos of Halibut Cove, including the location of the Saltry restaurant.

Over the years, there have been many close calls with float planes and local residents, and multiple float plane accidents. Many of the residents, including Ms. Beck, have voiced their concerns that the float planes travelling in and out of Halibut Cove were creating hazardous conditions for the residents. After too many close calls, the residents of Halibut Cove got together with the FAA and established a regulation for commercial aircraft operators in Halibut Cove. See Regulation, attached as Exhibit "C." The FAA member working with the community, Brad Sapp, attended the community meeting with two colleagues. In notifying the community of the meeting, he told the community, "Bring an open mind and a willingness to cooperate and I believe that we can help restore safety and peace of mind." See Brad Sapp message, attached as Exhibit "D." The primary concern of the community was the dangerous situation created when float planes taxied through the Narrows at the same time as one of the ferries. There was not enough room for the ferries and residents to safely maneuver in the cove at the same time as a float plane, and certainly not through the Narrows. In order to mitigate this risk, the regulation stated that "taxing in the West entrance (aka [the] "Narrows") shall not occur during the following scheduled ferry service times: 0945-1015; 1245-1315; 1545-1615; 1745-1815; 2045-2115; and 2245-2315." See Exhibit C.

Ms. Beck has her own traumatic history with float plane crashes, including several within Halibut Cove. Three of Ms. Beck's uncles died in three separate plane crashes. At a young age she witnessed a dog run out in front of a plane, ending in a bloody prop strike. Approximately 30 years ago, a plane with amphibious floats landed in Halibut Cove with its wheels down, causing it to cartwheel. Ms. Beck helped lift the plane with her boat to rescue the pilot. About 15 years ago, a plane crashed into the family's cabin at Leisure Lake killing the pilot and two family members. In 2016, a 206 crashed in Halibut Cove after an aborted landing, right in front of Ms. Beck's restaurant, narrowly missing the Danny J ferry carrying a full-load of passengers. Ms. Beck witnessed this crash personally, as she was standing on the dock to greet the passengers from the ferry. Shortly after this, a second plane crashed in the Narrows. All of these incidents led Ms. Beck to be highly anxious of planes in the Narrows, and especially in close proximity with the ferry.

In the days preceding the incident described in the factual basis, pilot E.L. had failed multiple times to abide by the community regulation, and had cut off the ferry on multiple days at 10:00 am, during a time period the community regulation prohibited float planes from taxing in the narrows. See Thurman letter, attached as Exhibit E. A community member described that his "wedging in between closely operated cove ferries on a time designated for boat operation placed us all at risk."

*Id.* Ms. Beck and other community members were angry and upset at the pilot's recklessness in their community.

On the day of the incident, Ms. Beck saw the same pilot, again departing at the same time as the ferry against the community regulation. She feared for her community and the safety of the passengers of the ferry. She was so upset that she got into her boat and chased after the pilot to send him a message that he was violating the community regulations and that she and the community were upset about it. Ms. Beck felt helpless and did not know what else to do.

Pilot E.L. was operating his seaplane in violation of the Halibut Cove Community Regulations and creating a dangerous situation. Navigation rules contained in the Code of Federal Regulations state that "[a] seaplane on the water shall, in general, keep well clear of all vessels and avoid impending their navigation." 33 C.F.R. § 83.18(e).

Attached is a letter from Elsa Bishop, who was at the helm of the Storm Bird ferry at the time of the incident. Bishop Letter, attached as Exhibit "F." Ms. Bishop has been operating commercial vessels in the Narrows for over 20 years, including the Danny J ferry. She describes several encounters with planes during the same summer of this incident, which prompted her to contact the managers at the Stillpoint to report what she saw to be reckless activity during her regularly scheduled commercial ferry traffic. She describes that at the time of the incident

with Ms. Beck, the tide was only a few hours past low, leaving the boat with less room than usual to maneuver out of the channel. She describes that the tide, added to the issue of navigating alongside a seaplane taxiing out, was a less than ideal situation. The incident happened on a Tuesday, which is when both vessels depart their docks at 10:00 am. She states that a seaplane deciding to depart at that particular time was very bad timing and could have been avoided easily on the part of the seaplane pilot.

Ms. Beck has been driving boats since she was in fifth grade. By the time she was in college, she had her 100-ton marine pilot's license. She has run boats for thousands and thousands of hours, including in winter conditions with high winds, ice and darkness. She has never had an accident in almost 60 years she has been driving boats. She is well-known for being highly skilled at navigating a boat. At all times during this incident, she was in control of the boat and knew the distance between her boat and the aircraft. At no time did she intend to harm the plane or make contact with the plane.

The factual basis makes note that the wake of Ms. Beck's boat resulted in water striking the propeller of the float plane, however this fact is of no significance. The pilot continued on his journey without incident. A mechanic inspected the plane and checked it off as airworthy. Two different aircraft facilities watched the video and determined that it did not meet the criteria of a "prop strike" and that the

wave action did not seem out of the ordinary for a seaplane operation. See Statement of E.L., attached as Exhibit "G" (redacted).

## II.  ADVISORY GUIDELINE CALCULATION

Appendix A in the Federal Sentencing Guideline Manual does not reference 46 U.S.C. § 2302(b).  For Class A misdemeanor offenses not specifically referenced in Appendix A, §2X5.2 applies and assigns a Base Offense Level of 6. USSG §2X5.2(a).  Ms. Beck has demonstrated acceptance of responsibility through truthfully admitting the conduct comprising the offense and has timely agreed to change her plea.  She should receive the two-point reduction for acceptance of responsibility pursuant to USSG §3E1.1, reducing her offense level to 4.  Ms. Beck has no criminal convictions and therefore no criminal history points. She is a criminal History Category I.  According to the new USSG Amendments, effective November 1, 2023, Ms. Beck should receive an additional two-point reduction for being a zero-point offender.  USSG §4C1.1.  Her total offense level is 2, with a guideline range of 0-6 months.

## III. A SUFFICIENT SENTENCE

Section 3553(a) requires courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2.  18 U.S.C. § 3553(a).  Ms. Becks' applicable guideline range falls within Zone A of the Sentencing Table.  The guidelines advise that for a nonviolent first offender in Zone

A or B, the court should consider imposing a sentence other than a sentence of imprisonment, and for offenders in Zone A, in some cases, a fine appropriately may be imposed as the sole sanction. USSG §5C1.1 Application Notes 2 & 4. Ms. Beck is statutorily eligible for a sentence of probation pursuant to 18 U.S.C. §3561 and USSG §5B1.1. The guidelines advise that the term of probation be no more than three years. USSG §5B1.2(a)(2). Because Ms. Beck's guideline falls within Zone A, the USSG advise that a period of community confinement, home detention or intermittent confinement is not required. USSG §5B1.1(a).

Of the mandatory conditions of probation listed in 18 U.S.C. §3563(a), condition (5) regarding drug testing is unnecessary in this case. The offense did not involve the possession, use or sale of controlled substances and Ms. Beck has no history of using controlled substances. This condition may be suspended by the court if there is a low risk of future substance abuse by the defendant. 18 U.S.C. §3563(a)(5).

## IV. § 3553 FACTORS

The court, in determining whether to impose a term of probation, and, if a term of probation is to be imposed, in determining the length of the term and the conditions of probation, shall consider the factors set forth in section 3553(a) to the extent that they are applicable. 18 U.S.C.A. § 3562.

### A.    Nature and Circumstances of the Offense

The circumstances surrounding the offense are described above. This was not a planned criminal offense and Ms. Beck stood to gain nothing personally from the offense. The offense was not committed out of malice or greed. This offense was the heated response to actions Ms. Beck viewed as endangering her community. The offense was not prompted by a substance abuse issue, or a need for money. The circumstances surrounding the offense show that it is highly unlikely to be repeated.

**B.    History and Characteristics of the Defendant**

Ms. Beck has been a law-abiding citizen the entirety of her life, for 70 years. She has no criminal convictions and has never been arrested. She is not prone to criminal behavior, and sought to gain nothing from her actions other than the safety of her community.

Ms. Beck's traumatic history with plane crashes is detailed above. She has lived in the small community of Halibut Cove her entire life and feels very protective of the community and its members. Ms. Beck is 70 years old and suffers from several medical issues. She suffers from a seizure disorder, which caused her to fall approximately three months ago, breaking some of her ribs. Four years ago, Ms. Beck fell from her horse and hit her head on a fence post. She had a loss of consciousness and suffers long term effects from the head injury. She developed

a bowel disorder that required a bowel resection and colostomy in January 2023.

She had the colostomy reversed during another surgery in August 2023.

### C.     Need for the Sentence to Meet the Sentencing Goals

#### 1.     Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

This offense is a misdemeanor.  The agreed upon sanctions in the plea agreement are extremely harsh for a 70-year-old woman with no criminal history. Ms. Beck has agreed to the maximum fine of $25,000 and to relinquish her Mariner License to the United States Coast Guard, in addition to a one-year period of supervised release or up to five years on probation.  Any greater sanction, such a jail time, would be far more than is necessary to meet this sentencing goal.  Ms. Beck has a life-long pattern of showing respect for the law and no further sanctions are needed to enforce that upon her.

#### 2.     Afford adequate deterrence to criminal conduct

Ms. Beck is not inclined to criminal behavior and a conviction of record, a $25,000 fine and probation is more than necessary to deter criminal conduct.  The fine of $25,000 is a large fine that will deter any similar conduct from others.

#### 3.     Protect the public from further crimes of the defendant

There is no risk of recidivism in this matter.  Ms. Beck has complied with the law for 70 years.  There is no pattern of behavior or other conduct to give reason to believe the public is at risk from further crimes of Ms. Beck.

### 4. Provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective matter

Ms. Beck is 70 years old and does not need education or vocational training. Because of the medical issues detailed above, and her age, she would not receive adequate medical care in BOP custody.  A sentence of probation is most appropriate here.

### D. Need to Avoid Unwarranted Sentencing Disparities

According to JSIN data, during the last five fiscal years there was an insufficient number of defendants whose primary guideline was §2X5.2 with a final offense level of 2 and criminal history category of I, after excluding defendants who received a §5K1.1 departure and who received a sentence of imprisonment in whole or in part.

Of offenders sentenced under USSG §2X5.2 with a final offense level of 4 (two levels higher than Ms. Beck) and a criminal history category 1, not including those with a §5K1.1 departure, 55% received a sentence of probation or a fine only.  See JSIN data attached as Exhibit "H."  A sentence of probation or a fine only is in line with similarly situated defendants for misdemeanor crimes generally.

Specific to 46 U.S.C. §2302, there are very few reported cases or searchable trial court orders involving this statute. Undersigned could find not a single case in which a person was charged with grossly negligent operation pursuant to 46 U.S.C. §2302(b) where there was no physical injury or collision. *See United States v. McKee*, No. 03-CR-SW-MDH, 2020 WL 13748172 (W.D. Mo. Sept. 4, 2020), report and recommendation adopted, No. 18-CR-05043-01-MDH, 2020 WL 13748171 (W.D. Mo. Dec. 3, 2020), aff'd, 68 F.4th 1100 (8th Cir. 2023)( A defendant charged with manslaughter and gross negligent operation of a vessel where 17 people died in a vessel sinking, but indictment dismissed for lack of jurisdiction); *United States v. Norwegian Cruise Line Ltd.*, 08-CR-20396-Moreno, S.D.F.L. (Norwegian Cruise Lines convicted of Grossly negligent operation where a boiler exploded and six seamen died); *United States v. Zenon Gogola*, 2:00-cr-00057, D.Maine (Defendant convicted of 46 U.S.C. 2302(b) grossly negligent operation for running a ship carrying 8,000 gallons of diesel fuel into a rock while operating under the influence and sentenced to 12 months probation).

Even in cases involving the lesser charge of negligent operation pursuant to 46 U.S.C. §2302(a), a collision, injury, or death occurred. *See Velez Amador v. United States Coast Guard*, No. CV 20-1724 (GLS), 2023 WL 2665591 (D.P.R. Mar. 28, 2023)( Finding negligent operation under 46 U.S.C. §2302(a) where negligent operation resulted in a collision); *United States v. Kyle Coleman*, 3:13-

cr-00030-RAM-RM, D.Vir.Is, Dkt. 4 (Defendant was charged and pleaded guilty to negligent operation under 46 U.S.C. §2302(a) for a fatal parasailing accident; defendant received one year probation and 6 months community confinement); *Green v. U.S. Coast Guard*, 642 F. Supp. 638 (N.D. Ill. 1986) (Affirming the assessment of a civil penalty of $1,000 for negligent operation 46 U.S.C. §2302(a) for boat operator passing too close to another boat, causing a wake that threw a passenger from their chair, causing an incapacitating injury and requiring medical attention).

Ms. Beck's conduct is the least serious of all of the above cited cases, and she should be sentenced accordingly.

## IV.    CONCLUSION

For all of the above reasons, Ms. Beck respectfully requests the Court sentence her to the agreed upon $25,000 fine, with one year probation.

DATED this 1st day of November, 2023.

Birch Horton Bittner & Cherot
Attorneys for Defendant


By:    s/    Michelle S. Nesbett
       Michelle S. Nesbett, ABA #0705028

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 1, 2023, a copy of the foregoing document was served via electronic mail on the following:

All individuals registered to receive electronic service in this matter.

BIRCH HORTON BITTNER & CHEROT

By:  s/ Michelle S. Nesbett

Case 1:23-cr-00001-TMB-MMS   Document 49   Filed 11/01/23   Page 14 of 14